395-08/PJG

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
MUR SHIPPING BV
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

MUR SHIPPING BV,

               Plaintiff,

    -against-

PIONEER RIGHT,

               Defendant.

-------------------------------------------------------x

**08 Civ.**

**VERIFIED COMPLAINT**

Plaintiff MUR SHIPPING BV (hereinafter "MUR"), by its attorneys Freehill Hogan &

Mahar for its Verified Complaint against Defendant PIONEER RIGHT (hereinafter

"PIONEER"), alleges upon information and belief as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff MUR was and still is a business entity duly organized and existing under the laws of a foreign country with an address at Atrium Building, Strawinskylaan, 3011, NL 10077 ZX, Amsterdam, The Netherlands.

3.    At all times relevant hereto, Defendant PIONEER was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at 271F White House Building, Hangzhou, China.

4.    On or about September 24, 2007, Plaintiff MUR, in the capacity as disponent owner of the M/V AFRICAN WILDCAT, entered into a maritime contract of charter party with Defendant PIONEER for a voyage of two legs, the first of which was from China to West Africa and the second of which was from West Africa to Singapore/Japan range. The fixture recap dated September 24, 2007 and charter party dated November 29, 2004, from which certain terms and conditions were incorporated is attached as Exhibit A.

5.    The vessel was duly delivered to Defendant PIONEER and the voyages were performed.

6.    Following the redelivery of the vessel, Plaintiff MUR submitted its final hire statement to Defendant PIONEER showing a balance due in Plaintiff MUR's favor in the amount of $193,521.68. A copy of Plaintiff MUR's hire statement is attached as Exhibit B.

7.    In breach of the terms of the charter party, and despite due demand, Defendant PIONEER has refused or otherwise failed to pay the amount due and outstanding and the full amount of $193,521.68 remains due and owing.

8.    The charter party provides for the application of English Law and any dispute arising thereunder is to be referred to arbitration at London, and MUR specifically reserves its right to arbitrate the substantive matters at issue.

9.      This action is brought to obtain security in favor of Plaintiff MUR in respect to its claims against Defendant and in aid of the London Arbitration proceedings.

10.     Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

11.     This action is further brought to obtain security for the additional sums which are recoverable including Plaintiff's anticipated attorney and arbitrators' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

12.     Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in London arbitration will be $50,000, and interest on its damages are estimated to be $38,704.32 (calculated at the rate of 8% for a period of 2½ years, the estimated time for completion of the proceedings in London) including any appeal of any arbitration award issued.

13.     Sun Shine Shipping Ltd. a/k/a Sunshine Shipping Ltd. is an entity which acts in the capacity as an agent and/or manager and/or paying agent of Defendant PIONEER and receives, holds and/or transfers assets for and on behalf of Defendant PIONEER.

### Request for Rule B Relief

14.     Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter

hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name or for its benefit, including those in the name of its paying and/or funding agent SUN SHINE SHIPPING LTD. a/k/a SUNSHINE SHIPPING LTD. at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

15.     The total amount to be attached pursuant to the calculations set forth above is $282,226.00.

WHEREFORE, Plaintiff MUR prays:

a.      That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.      That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including $282,226.00 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its own name or as may be held, received or transferred for its benefit, and/or in the name of its paying agent and/or funding agents SUNSHINE SHIPPING LTD. and SUN SHINE SHIPPING LTD., at, through, or within the possession, custody or control of such banking

institutions and/or any such other garnishees who may be served with a copy of

the Process of Maritime Attachment and Garnishment issued herein;

c.     That this Court retain jurisdiction over the matter for any further or supplemental

proceedings as may be necessary, including but not limited to an order compelling

Defendant to arbitrate and/or the recognition and enforcement of any award or

judgment entered against the Defendant; and

d.     That this Court retain jurisdiction over the matter for any subsequent enforcement

action as may be necessary; and

e.     For such other, further and different relief, as the Court may deem just and proper

in the premises.

Dated: New York, New York
      July 17, 2008

                        FREEHILL HOGAN & MAHAR LLP
                        Attorneys for Plaintiff
                        M̶U̶R̶ SHIPPING BV

                        By: _____
                              Peter J. Gutowski (PG 2200)
                              Pamela L. Schultz (PS 8675)
                              80 Pine Street
                              New York, NY  10005
                              (212) 425-1900

## ATTORNEY VERIFICATION

State of New York      )
                       ) ss.:
County of New York  )

PAMELA L. SCHULTZ, being duly sworn, deposes and says as follows:

1.      I am an associate with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Pamela L. Schultz

Sworn to before me this
17th day of July, 2008

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/ 10

```
Print For: eho
Type.....: Email - Internet
Msg.Nr...: IN 1257818
Created..: 24-Sep-2007 19:29
From.....: Shitao Xie <handy.uk@maerskbroke
Subject..: pioneer/african wildcat
Comment..: Recvd: (CPID:1/SECS:6)
```

REF : STX56657435
DATE: 24-09-2007
TIME: 09:25:41 (GMT)

dave / xie

re: pioneer/african wildcat

pleased to confirm vessel clean fixed on foll terms and conditisons
with cp date 24 sep 2007.

MV AFRICAN WILDCAT EX MV MARQUISA
BLT 97 CLASS LR BAHAMAS FLAG
CALL SIGN 9MER8
LOG/BULK CARRIER
ABT 26,412 MTS DWAT ON 9.536M SSW TPC 37.9-SUMMER
LOA/BM 168.60/26.00 M
GRT/NRT 16,041/9280
5H/5H GRAIN/BALE CBM 33,858.14/32,699.81
4 X 30 T SWL CRANES
AVERAGE SPD/CONS
BALLAST:ABT 14.0 KTS ON ABT 23 MTS 380CST NDAS
LADEN : ABT 14.0 KTS ON ABT 25 MTS 380CST NDAS
IN PORT:ILDE-ABT 1.0 MTS IFO PLUS 1.0 MT MDO
WRKG-ABT 1.8 MTS IFO PLUS 1.8 MTS MDO
THE SPD/CONS IS BSS GOOD WEATHER CONDITIONS AND NO ADVERSE CURRENT AND
NO NEGATIVE INFLUENCE OF SWELLS AND NOT EXCEEDING BEAUFORT SCALE FORCE
4 AND DOUGLAS SEASTATE 3.
BKR SPEC:IFO-380CST ISO 8217 (1996) RMG35
MDO-ISO8217(1996)DMB
VLS HAS LIBERTY TO USE MDO FOR MANOUVERING IN NARROW WATERS, CANALS,
RIVERS, ON ENTERING /LEAVING PORTS AND IN ADVERSE WEATHER OR WHEN THE
GENERATOR LOAD IS LOWER THAN 50PCT WHILST IN PORT IDLE.
ALL DETAILS ARE ABOUT, GIVEN IN GOOD FAITH AND WITHOUT GUARANTEE    WOG

Disponent Owners: MUR Shipping B.V.

C/HOLD NO.1 FIXED STANCHIONS HEIGHT   -7.00 M
           PORTABLE STANCHIONS HEIGHT-6.80 M

C/HOLD NOS.2-5 FIXED STANCHIONS HEIGHT-8.00 M
               PORTABLE STANCHIONS HEIGHT-7.80 M

Owners do not guarantee the vessel is a fully fitted logger. It is for

EXHIBIT
A

chrtrs time / risk and responsibility to ensure vessel has sufficient
lashing material  on board for a full cargo of logs on/under deck.
Owners have supplied the  required inventory list as received from the
Master on the 10th September 2007  which is given in good faith wog.


for

1. Account: Pioneer Right

27/F White House Building,
Hangzhou
China
Tel: 0086 571 85812391

2. Delivery: dlosp 1sp Tobata, Japan atdnshinc.

3. For 2ll. First leg from China to West Africa and second leg from
West Africa to Singapore/Japan range. Dur abt 110 days WOG. Trading
always via sps sbs sas always afloat always accesible and always
within iwl. Always excluding cement, cement clinker, salt, scrap of
any kind, petcoke, sulphur, concentrates, mineral sands and soda ash.
Bagged cement ok and west african log alwasy allowed (chtr's major
cargo okoume plus various kinds of hardwood) provide loaded
always within vessels strength and ability.


Hold Cleanliness
════
VSLS HOLDS ON ARRIVAL FIRST LOADPORT TO BE CLEAN/SWEPT/WASHED DOWN AND
DRIED UP SO AS TO RCV CHTRS INTENDED CGO OF BAGGED CEMENT FREE OF
SALT, LOOSE RUST SCALES N PREVIOUS CGO RESIDUE TO THE SATISFACTION OF
INDEPENDENT SURVEYOR. IF VSL FAILS TO PASS HOLD INSPECTION, THE VSL
SHUD BE PLACED OFF-HIRE FM THE TIME OF REJECTION UNTIL THE VSL PASSES
THE SAME INSPECTION AGAIN AND ALL PROVEN DIRECTLY RELATED EXPENSES
OCCURRED TO BE FOR OWNS ACCOUNT AND ALWAYS LIMITED TO ONE SHIFT OF
STEVEDORe STANDBY.

4. Laycan: 29th September / 5th October 2007

5. Redelivery: dlosp 1sp Singaproe / Japan rge atdnshinc, pico

6. Hire: USD 39,500 pdpr inclot payable every 15 days in advance

7. Bunkers on delivery to be abt 350/450 mt ifo and abt 50 mt mdo.
Chrts to take over bunkers on delivery and pay for value of bunkers on
delivery with first hire payment. Bunkers on redelivery abt same qty
as actual qts on delivery. Chopt to deduct value of bunkers on
redelivery from last sufficient hire payment. Prices bends Usd 400.00
pmt ifo and Usd 675.00 pmt mdo. Chrtrs/Owners have the right to bunker
vsls prior to delivery/redelivery provided same does not interfer with
Owners/chrtrs operation of the vessel.

8. Ilohc: Usd 4,500 lumpsum excluding any dunnage/debris removal
   Intermediate Hold cleaning: usd800 per hold

9. cables/victualling/entertainment: Usd 1,200 per month pro rata

10. 3.75pct addcom plus 1.25pct to Maersk Broker

11. others as per Owners b-t-b head c/p attached with logical
    amendments and alteration except for

main body:
==

line 56: change '30' to '25'

line 138 and 139: delete, and replace with
'dry docking to be allowed during the currency of this Charter Party
only in case of emergency.

rider clauses:
==

cl 29: add:
however, charterer have the option of redilivering the vessel without
removing them, paying usd10.00 per piece in lien thereof.

cl 36: please advise owner's PnI club: GUARD

cl 63: delete

Cl 75 -

MUR(OWS) BANK DETAILS :-

BENEFICIARY NAME
FIRSTRAND BANK LTD
BANK CITY, JOHANNESBURG,
SOUTH AFRICA
FFC/ MUR SHIPPING HOLDINGS BV

A/C  1801028001

BENEFICARY BANK
CHASE MANHATTAN BANK, LONDON
SWIFT:  CHASGB2L)
SORT CODE:  60-92-42
A/C  22002810

CORRESPONDENT BANK
CHASE MANHATTAN BANK, NEW YORK

(SWIFT:  CHASUS33)

cl 93: delete

cl 100: insert "in South Africa only" after "rmf 25"

end
====

thansk for your great support leading to this fixture, and please

confrim by return all above in line with your record.


Best Regards,

Shitao Xie    Maersk Broker UK
Direct Line: 0044 20 7481 6002
Mobile:        0044 79 7959 5742
Fax:           0044 20 7481 4686
Email: handy.uk@maerskbroker.com
Visit: www.maerskbroker.com
Msn:    stx@maerskbroker.com




------------------------------------------------------------------------
This message (including all attachments) is confidential and is
intended only for the above addressee(s). If you are not the intended
recipient, you must not read, print, retain, copy, distribute, or use
any of the information herein. If you receive this message in error,
please delete it and immediately notify the sender.


Although we have taken reasonable care to ensure that any attachments
to this e-mail are free of viruses, we make no representation and give
no warranty in this regard. You should accordingly scan any
attachments with appropriate up to date software.
------------------------------------------------------------------------

# Time Charter

## GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in *Rungsted* ............................ *29 ... day of November 2004* ...... *19* ......

2  Between ......................................................................................................................................................................

3  Owners of the good .............. *See Clause 44* Steamship/Motorship *"AFRICAN LEOPARD" ex "PACIFIC MATSU"* ...... of ......

4  of ........................................ *tons gross register, and* ...................... *tons net register, having engines of* .................. *indicated horse-power* ......

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed ......................................................................

6  at ............................ *of about* .............. *cubic feet bale capacity, and about* ......................................... *tons of 2240 lbs.*

7  deadweight capacity, (cargo and bunkers, including fresh water and stores not exceeding one-and-one-half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of ......................... *feet* ...................... *inches on* ...................... *Summer freeboard, inclusive of permanent bunkers,*

9  which are of the capacity of about ............................ *tons of fuel, and capable of steaming, fully laden, under good weather*

10 conditions about .............. *knots on a consumption of about* .................. *tons of best Welsh coal—best grade fuel oil—best grade Diesel oil,*

11 now ................................................................................................................................................................................

12 ...................................................................................................................................................................................

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 *about trading via safe port(s), safe berth(s), safe anchorage(s), always afloat,* .........................................................................

15 *always accessible within Institute Warranty Limits*

16 —— within below mentioned trading limits.

17 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

18 the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*

19 Vessel to be placed at the disposal of the Charterers, at .........................................................................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available the time to count as provided for in clause No. 5. Vessel on her *arrival first and*

22 *subsequent loadport(s) of the first voyage* delivery to be ready to receive any permissible cargo to Charterers' independant surveyor's satisfaction. Should the vessel fail to pass such survey then, *the vessel to be off-hire from time of failure until vessel is fully accepted. On delivery and throughout the Charter vessel to be with clean swept holds—and* tight, staunch, strong and in every way fitted for the service, having water ballast, *cranes* winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* winches at one and the same

23 ...................................................................................................................................................................................

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, including petroleum or its products, in proper containers, excluding *see Clause 37.* ................................................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in

28 British North America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America *Trading Exclusions (see also Clause 67)* ................................................... *and/or Europe*

and *Mehdi and Rohtstoff Shipping (and Holdings) B.V.* Charterers of the City of *Amsterdam.*

30  and/or Africa, and/or Asia, and/or Australia, and/or New-Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,
32
33
34
35  as the Charterers or their Agents shall direct, on the following conditions:
36      1.    That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and*
37  *watchmen/garbage removal other than compulsory;* shall pay for all the insurance on the vessel, also for all the cabin, deck, *engine-room* and other necessary stores, including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment *with all certificates necessary to comply with current*
39  *requirements at all ports of call* for and during this service.
        2.    That *whilst on hire the* Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary Pilotages, and*
40  *also pilotages in Danish waters in laden condition from Grena to Spodsjerg/Altingen also, if requested by Master due to poor visibility*
41  *or adverse weather, pilotage in English* Channel, Agencies, Commissions,
42  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
43  a port, for cause for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
44  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
45  charter to be for Charterers account. All other Fumigations to be for Charterers account after vessel has been on charter for a continuous period
46  of six *three* months or more.
            Charterers are to provide necessary damage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
47  Owners to allow them the use of any dunnage *and any other fittings* and shifting boards already aboard vessel. Charterers to have the privilege of using
48  ~~shifting boards~~
49  ~~for dunnage, they making good any damage thereto.~~
50      3.    That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
51  board the vessel at the current prices in the respective ports; the vessel to be delivered with not less than ............... tons and not more than
52  ........................ tons and not more than ...................... *as per Clause 75* ................................
53                         United States Currency per ton on vessel's total bunker capacity, including spare.
54      4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 35* ....................... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
55  ~~stores, on~~ ............... *summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at and* after the same rate for any part of a day; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
56  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot works wide trading limits in Charterers' option any*
57  *time day or night Sundays and holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than ......30/0/015 days
58  notice of vessels expected date of re-delivery, and probable port.
        5.    Payment of said hire to be made in *to the bank account designated by Owners in* ~~in New-York~~ in cash in United States Currency,
        ~~semi-monthly~~ *15 days* in advance, and for the last *15 days* ~~half-month or~~
60  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
62  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
63  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *(see Clause 62).* ~~Time to count from 7 a.m. on the~~
64  ~~working-day~~
        ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
65  ~~to have the privilege of using vessel at once, such time used to count as hire.~~
66      Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
67  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
68  of such advances.
        6.    That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place or *anchorage in port or elsewhere* that Charterers

69  or their Agents may
70  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places~~
71  ~~where it is customary for similar size vessels to safely.~~
72  ~~be aground.~~
73  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
74  accommodation for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
75  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodation allow. Charterers~~
76  ~~paying Owners.................... per day per passage for accommodation and meals. However, it is agreed that in case any fines or other expense are~~
77  ~~incurred in the consequence of carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*
78  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
79  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
80  agency, and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign *or when*
81  *required by Charterers or their Agents to sign on his behalf* Bills of Lading for
82  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
83  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
84  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
85  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
86  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
87  rate of US$10.00 ~~$1.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
88  Clerks, Stevedore's Foreman, etc., Charterers *to compensate Owners lumpsum US$.................. or pro-rata in respect of Charterers'*
89  *victualling, communication and entertaining.*
90  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
91  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
92  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and
93  the con-
94  sumption of fuel *as well as revolutions of main engine and velocity of and direction of wind and sea, all English language.*
95  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
96  13.  ~~That the Charterers shall have the option of continuing this charter for a further period of............~~
97  14.  ~~That if required by Charterers, time not to commence before.................~~ days previous to the expiration of the first-named term, or any declared option
98  ~~on giving written notice thereof to the Owners or their Agents............~~ and should vessel
99  ~~not have given written notice of readiness on or before.................~~ but not later than 4 p.m. Charterers or
100 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
101 15.  That in the event of the loss of time from deficiency *and/or default and/or strike of crew and/or* of men, or *deficiency* of stores, fire,
102 breakdown or damage to hull, machinery or equipment,
103 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
104 *whatsoever* preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *and all extra expenses may be*
105 *deducted from the hire,* and if upon the voyage the speed be reduced by
106 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
107 thereof, and all extra expenses shall be deducted from the hire.
108 16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
purpose of saving life and property.
17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London New York,*
one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. *See further Arbitration Clause 30.*

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including

111  General Aver-
112  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
113  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
114  might have priority over the title and interest of the owners in the vessel.

115  19. That all derelict and salvage shall be for Owner's and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
116  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
117  York-Antwerp Rules 1974 *as amended 1994 or any amendment thereto at London as to matters not provided for by these rules, according to the Law and usages of London 1974,* ~~at such port or place in the United States as may be selected by the carrier, and as to matters not provided for~~
118  ~~by these~~
119  ~~Rules, according to the laws and usages of the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
120  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
121  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
122  ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
123  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
124  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
125  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
126  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
127  ~~United States money.~~ *Charter hire not to contribute to General Average*

128  20. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

129  21. Fuel used by the vessel while off hire, also ~~for cooking, condensing water, or~~ for grates and stoves to be agreed to as to quantity, and the
130  cost of replacing same, to be allowed by Owners.

131  ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
132  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
133  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

134  ~~Dry-docking is to be allowed as per drydocking schedule of each individual vessel. It is understood that dry-docking to take place within~~
135  ~~Singapore/Japan range.~~

136  22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes and/or grabs* ~~derricks~~) capable of handling lifts up to *their maximum*
137  *capacity in accordance with the Description Clause* ~~three tons, also~~ providing ropes, falls, slings and blocks. ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
138  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric light on*
139  *deck and in cargo holds as on board sufficient for night work in all holds simultaneously* ~~lanterns and oil for~~
140  night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
141  Charterers to have the use of any gear on board the vessel.

142  23. Vessel to work night and day, if required by Charterers, and all *cranes and/or grabs* winches to be at Charterers' disposal during loading and
143  discharging; ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
144  ~~deck-hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rule of the~~
145  ~~port, or labor unions, prevent crew from driving winches, shore Cranemen Winchmen to be paid by Charterers. In the event of a disabled *crane or grab*~~
146  *or cranes and/or grabs unless caused caused by stevedores* winch or winches, or

149    insufficient power to operate *crane or cranes and/or grabs* winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay
       any loss of time *and extra directly related expenses including but not limited to standby expenses,* occasioned
       thereby.

130    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
151    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
152    etc., in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to *attached protective clauses*
153    *following clauses, both*
       ~~of which are to be included in all bills of lading issued hereunder.~~

154    ~~U. S. A. Clause Paramount~~
156    ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April~~
157    ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158    ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159    ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160    ~~Both-to-Blame Collision Clause~~
161    ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162    ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163    ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164    ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165    ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166    ~~owners as part of their claim against the carrying ship or carrier.~~

167    25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169    port or to get out after having completed loading or discharging. *Vessel never to force nor push ice nor to follow ice breaker, nor trade to areas*
       *where there is a danger of sea ice*

170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171    navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

172    27. A commission of 2 1/2 per cent is payable by the Vessel and Owners to

173    ............................................................................................................................................................................................................................................................
174    .............................. on the hire earned and paid under this Charter, and also upon any confirmation or extension of this Charter.

175    28. An address commission of 2 1/2 per cent payable to ............................................................... on the hire earned and paid under this Charter.

*Clauses 29 through 169 are fully incorporated in this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

### RIDER CLAUSES TO M.V. "AFRICAN LEOPARD" CHARTER PARTY DATED

29.  **Additional Fittings**

Charterers to have the option of welding padeyes and angles, except on fuel tank tops and hoppers, and epoxy painted areas, at their own arrangement expense subject to Master's prior consent and supervision.

Charterers to remove all padeyes and angles at Charterers' time and expenses under the Master's supervision before redelivery, unless Owners request Charterers to maintain same without removal, in which case Charterers will be free from removing padeyes and angles.

30.  **Arbitration**

This Charter Party shall be governed by English Law. The arbitration shall be conducted in accordance with the London Maritime Arbitrators' Association (L.M.A.A.) terms current at the time when the arbitration proceedings are commenced.

It is hereby agreed that all claims below US $ 50,000 excluding interest and costs shall be settled as per LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

31.  **Arrest**

Should the vessel be arrested during the currency of this Charter at the suit of any person (including the Charterers) having or purporting to have a claim against or any interest in the vessel, except that arrest is caused by cargo claims to which Owners/Master are not responsible or claims incurred due to irregularity of Bills of Lading issued under Charterers' Letter of Indemnity, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest and remains unemployed as a result of such arrest and the Owners shall reimburse to the Charterers any expenditure which they may incur under this Charter in respect of any period during which by virtue of the operation of the Clause no hire is payable.

32.  **Asian Gypsy Moth**

Owners guarantee that upon delivery to Charterers the vessel is free of any infestation by the Asian gypsy moth or its eggs. Should the Owners fail to fulfil their guarantees as above, the Owners shall indemnify the Charterers from any loss or damage sustained by Charterers and all consequences arising from/in connection with such failure including but not limited to any delay, extra expenses, fines, cost of removal of such moth or its eggs and/or even trans-shipment of cargo if on board, regardless of whether or not the vessel would be banned from entering into or ordered to leave the Canadian and/or U.S. waters/ports because of said failure.

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

When Charterers direct the vessel to the area infested by Asian gypsy moth, Charterers shall, at Charterers' time and expense, undertake to arrange a certificate issued by an appropriate authority of such area/port certifying that the vessel is free from infestation by Asian gypsy moth or its eggs and thereby Owners shall not be held responsible for any consequences at the next destined ports.

33.    **Bill of Lading**

The Charterers or their Agents are authorised to issue and sign Bills of Lading and/or Sea Way Bills on Charterers' form on Owners' and/or Master's behalf, in which case the Charterers to indemnify Owners against all consequences or liabilities arising from their so signing of Bills of Lading and/or Sea Way Bills on Owners' behalf.
No through Bills of Lading to be used.

34.    **Bulldozers**

Charterers to have the option to use the bulldozers in vessel's holds, provided not exceeding the tank top strength.  If required the vessel to lift onboard the bulldozers by use of vessel's gear.

35.    **Bunkers**

Bunkers on delivery about  metric tons IFO and about  metric tons MDO.
Bunkers on redelivery to be about same quantity of IFO as on delivery and maximum  metric tons MDO.
Bunker prices both ends: USD  per metric ton Intermediate Fuel Oil and USD per metric ton MDO.

Charterers' option to supply RMF 25 in South Africa.

Charterers to pay bunker value on delivery together with first hire.

Owners have the option to supply bunkers for the vessel at bunker/loading/ discharging port of last voyage, provided not affecting Charterers' cargo intake and loading/discharging operations.
See also Clause 100

36.    **Cargo Claims/ P & I Club**

Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association which is a member of the Group of International P & I Clubs for the duration of this Charter Party.  Entry shall include, but not to be limited to, ordinary cover for cargo claims.

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

In the case of damage to and/or loss of cargo carried on the vessel in which Owners' and/or Charterers' liability could be involved under the terms of this Charter Party, as the case may be, the Owners and/or the Charterers shall on request grant reasonable time extension for commencement of such in each and every occurrence. Such extensions shall not prejudice the ultimate responsibility of both parties.  Liability for cargo claims as between Charterers and Owners, shall be settled in accordance with the Interclub New York Produce Exchange Agreement of September 1996 and any subsequent amendments.

Owners' P & I Club:

If required by Charterers, Owners to authorise and instruct Owners' P & I Club to confirm directly to any party as ordered by Charterers that the vessel is fully covered for P & I and that collection of premiums are up to date.

37.

### Cargo Exclusions

It is understood that the vessel is not employed in the carriage of the following cargoes:

Livestock, tar, turning and motor blocks, nuclear and radioactive materials and its waste, petroleum and its by-products, pitch in bulk, sodium sulfate, sulphur, logs, HBI, calcium hydrochloride, bonemeal, charcoal, turpentine, seed cake, oil cake, pke, cement, cement clinker, scrap of any kind, petcoke, copra, pond coal, pebbles, sponge iron, asphalt, arms, ammunition, sunflower seeds expeller, ammonium nitrate (explosive grade), naphtha and its products, direct reduced iron, asbestos, hides, creosoted goods, calcium toxic waste, carbide, potash, mineral sands, soda ash, borates, pig iron, logs, grain, explosives (black powder, blasting caps, detonators, loaded bombs, dynamite and TNT), acids, brown coal, fishmeal, ammonium nitrate, ammonium sulphate, possium nitrate, sodium sulphate, salt, dangerous and inflammable cargo.

DRI and DRIP not to be allowed, cargoes excluded by flag state not to be carried, oilcakes and seedcakes not to be allowed and any cargo requiring $CO_2$ fittings not to be allowed..

All cargoes carried under this charter to be loaded, stowed, carried and discharged in accordance with recommendations of Imo Code of Safe Practice in accordance with IMO/local authority recommendations for such cargo.

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

Steel Cargoes

A joint pre-shipment survey to be arranged with Owners and Charterers

P & I clubs and cost of survey to be shared between Owners and Charterers with copy reports being made available to both parties. Charterers' P & I Club to arrange surveys and furnish copy to Owners.

Vessel not to be called upon to stow by use of "block California stow method".

Heavy Coils

If required by Charterers, Owners confirm that heavy steel coils may be loaded line for line in as many tiers as is necessary but always within vessel's permissible tanktop strengths and to Master's satisfaction with regard to stress, trim and stability requirements. Coils to be loaded in accordance IMO and in compliance with local load/discharge port authorities regulations.

Concentrates

Charterers' option to load concentrates, always in accordance with IMO, Canadian Board of Trade and local regulations and recommendations. Moisture test of cargo to be taken by competent authority just prior to loading and a certificate, stating moisture content is within Imo regulations, to be handed to Master prior loading commences. All costs for Charterers account.

38.    **Certificates/Vaccinations**

Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings enabling the vessel and her crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.

Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain radio free pratique.

If requested, Owners to provide Charterers with copies of any certificates/ approvals.

Any time lost and all extra expenses resulting from Owners' non-compliance

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

with the above to be for Owners' account and may be deducted from hire.

39.    **Crew Service (see also Clause 79)**

With reference to Clause 8 of this Charter Party "customary assistance" shall include but not be limited to:

a)    All opening and closing of hatches, when and where required.

b)    Raising and lowering of derricks and rigging cranes, if fitted, and/or gangways in preparation for loading and discharging.

c)    Shaping up vessel's holds/hatches and cranes, if fitted, as much as possible prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations.

The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and crew required under this Charter Party.

40.    **Deck Cargo**
Chartereres have the option to carry cargo on deck at their own risk and expense but always within vessel's stability, within vessel's deck and hatch cover strength, in accordance with solas/IMO Rules, and Master's prior approval and satisfaction.

Charterers to provide and pay for all lashing and stowing/securing material and/or fitting required.

Bills of Lading for deck cargo to be claused "shipped ondeck at Charterers/Shippers/receivers risk, responsibility and expense and without liability on the part of the vessel or her Owners for any loss of damage, expense or delay whatsoever and howsoever caused.

41.    **Deductions**

The Charterers may deduct from the Charter hire any amount disbursed for Owners' account provide written approval granted by Owners. In addition, Charterers may deduct from the last hire payment max USD 100.00 per port for the estimated expenses incurred by Charterers for Owners' account, notwithstanding that vouchers may not then have reached Charterers for submission to Owners, provided that the difference between estimated expenses and actual expenses shall be adjusted and settled when vouchers available.

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD" CHARTER PARTY DATED

42.    **Delivery of Cargo against Letter of Indemnity**

In case of non availability of original Bill(s) of Lading at discharge port(s), Owners/ Master to allow discharge/release/change of destination of entire cargo against a single Letter of Indemnity in Owners' standard P and I Club wording signed by Charterers (MUR) only.

In the event that Charterers instruct the vessel to change discharging port after Bills of Lading or Sea Way Bills have been issued, Owners shall comply with such instructions upon receipt of a faxed copy of a single Letter of Indemnity always giving reasons for deviation, on Owners' standard P & I Club wording signed by Charterers' only. Original change of destination Letter of Indemnity to follow by mail.

43.    **Delivery/Redelivery Time**

Delivery and redelivery time to be calculated basis Greenwich Mean Time.

44.    **Description Clause**

mv AFRICAN LEOPARD – ex mv PACIFIC MATTSU

All details are "about" and given in good faith and without guarantee

Singledeck, log/bulkcarrier – built 1996 – Malaysian Flag, classed Lloyds
Call sign: 9MER9
About 26,516 metric tons dwat on 9.536 metres summer salt waater
TPC 37.9
LOA/Beam: 168.70 metres/26.00 metres
International GT/NT: 16041/9280
5 holds/hatches
Australian hold ladder fitted
$CO_2$ fitted
Grain/bale: 33,959.14/32,699.81 cubic metres
4 cranes 30 tons SWL

Speed/consumption
      Ballast: about 14.0 knots on about 23.0 metric tons IFO 380CST
          no diesel at sea
      Laden:  about 14.0 knots on about 25.0 metric tons IFO 380CST
          no diesel at sea
      In port: Idle, about 1.0 metric tons IFO plus 1.0 metric tons MDO
          Working about 1.8 metric tons IFO plus 1.8 metric tons MDO

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

The above speed and consumptions are given basis good weather conditions, no adverse current, no negative influence of swells and not exceeding Beaufort Force 4 and Douglas State of Sea 3.
Bunker specifications: IFO 380CST ISO 8217 (1996) RMG35
                                        MDO ISO8217 (1996) DMB
Vessel has liberty to use MDO for manouvering  in narrow waters, canals, rivers on entering and leaving ports and in adverse weather or when the generator load is lower than 50% whilst in port idle.

45.    **Double Banking**

Charterers have the right to load and/or discharge on double banking basis at loading and/or discharging port at a safe dock or wharf or anchorage where it is customary and safe for vessels of similar size and type to do so, always subject to Master's reasonable satisfaction.

Any additional equipment/ facilities such as fenders whenever considered necessary by the Master are to be supplied by the Charterers in their time and at their expense.  If at any time during the operation the master reasonably considers it unsafe to continue due to adverse weather conditions etc., he may order the other vessel(s) and/or barge(s) away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s).  Any additional insurance premium net of all rebates, if required by vessel's Underwriters to be for Charterers' account.  Amount not to exceed the premium calculated on the basis of an advisory rate quoted by the Chairman of Breach of Warranty Committee on the London market.

46.    **Houseflag/Markings**

The Charterers shall have the liberty of flying/marking their own flag at their expense.

47.    **Boycott**

Owners warrant that the vessel's crew is and will be during the period of this Charter Party employed under a bona fide agreement, the standard of which is fully acceptable to the ITF and Unions in all countries not excluded in this Charter Party.  In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restrictions, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to government restrictions, all caused by the vessel and/or by reason of the terms and conditions on which members of the crew are employed or by reason of any trading of this or any other vessel under same ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra expenses incurred due to above are to be for Owners' account and may be

7

# RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

deducted from hire.

48.    **In Lieu of Hold Cleaning**

Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum of USD 5000 lumpsum in lieu of such cleaning including removal/disposal of dunnage/lashing material except if vessel redelivered in the United States

49.    **Bimco U.S. Security Clause**

If the vessel calls in the United States, including any U. S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:
Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees and inspections, shall be for the Charterers' account, unless such costs or expenses results solely from the Owners' negligence.

50.    **Insurance**

Basic war risk insurance and crew war bonus to be for Owners' account. In the event Charterers employ the vessel in a trade for which there is an additional war risk insurance premium on hull and machinery, Charterers to pay such additional premium on vessel's current war risk policies but in any case not to exceed that for minimum coverage under the London Underwriters' minimum scale.

Such extra insurance premium for Charterers' account to be settled with next hire payment after receipt of proper vouchers from the Owners' Underwriters.

If war situation becomes serious, Owners have the right to refuse the vessel entering into war zone, and Owners and Charterers shall further discuss in good faith an alternative arrangement. Conwartime 1993 Clause to be incorporated in this Charter Party.

51.    **Intermediate Hold Cleaning**

If requested by Charterers and permitted by shore/stevedore regulations as well as weather/sea conditions, crew will carry out intermediate hold cleaning for Charterers. Charterers to pay Owners USD 1000 per hold, but USD 1200 per hold for salt/petcoke and USD 1500 per hold for cement however, the

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

Master/crew/vessel are not held responsible for results/consequences of such intermediate hold cleaning. Owners are not responsible for passing cargo hold cleanliness inspection.

52.    Forklift trucks/bulldozers/grabs/magnets etc. shall be allowed to be used in the holds if necessary, provided always within the vessel's permissible load.

53.    **Loading of Steel**

Steel cargoes to be sufficiently dunnaged/lashed/secured and unlashed/ unsecured at Charterers' expense, risk and in their time by stevedores under the supervision of the Master and up to his satisfaction.

Charterers agree, if so requested by Owners to jointly appoint an independent surveyor to perform a pre-loading survey of the cargo with time and cost equally shared.

54.    **Notices**

Owners are to give Charterers 15 days definite notice of vessel's delivery and are to let Charterers know immediately of any change in vessel's position.

55.    **Off-Hire**

Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person on board the vessel (other than passengers or supercargo travelling by request of the Charterers), or by reason of the refusal of the Master or crew to perform their duties, or oil pollution, even if alleged, or capture/seizure or threatened detention by any authority/legal process, the hire shall be suspended from the time of inefficiency until the vessel is again efficient in the same or equidistant position in Charterers' option and voyage resumed therefrom. All extra expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

During any off-hire period estimated to exceed 10 days, the Owners to give the Charterers not less than 5 days definite notice of resumption of the service.

If the vessel has been off-hire for a period of more than 40 days, the Charterers are at liberty to cancel the balance of this Charter Party, in which case redelivery shall take place upon vessel being free of cargo, irrespective of redelivery ranges. Charterers' option to add any off-hire periods provided such option is declared 90 days prior to last day of redelivery.

56.    **Oil Pollution**

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

Owners guarantee to provide and maintain during the entire timecharter period at their expense and carry on board the vessel a valid U.S. Certificate of Financial Responsibility. Owners also guarantee to have secured current certificates for other countries/federal states or municipal or other division or authority thereof, where such certificates and/or guarantee are required. All such certificates to be valid throughout the entire timecharter period.

The Charterers shall in no case be liable for any damage as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any direct consequential losses, damages or expense.

57.    **On/Off-Hire Survey**

At port of delivery, in Owners' time and at last discharge port prior to redelivery in Charterers' time a joint on/off-hire survey to be held by a single independent surveyor jointly appointed. Cost of same to be equally shared between Owners and Charterers. Vessel only to be off-hire for actual working time lost due to surveys.

58.    **Panama/Suez Canal**

Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with all warranties contained in this clause and/or any regulations or conditions of transit laid down by the relevant authority, Charterers may suspend hire for all time lost and Owners to pay all expenses arising as a consequence of Owners' failure to comply with the warranty.

59.    **Plans**

Owners to courier to the Charterers Capacity Plan, Deadweight Scale and General Arrangement Plan upon delivery or as early as possible thereto.

60.    **Power Clause**

The vessel to supply free of expense to Charterers' account 440 volt 3 phase 60 cycles per crane from the slip ring of the crane within the maximum capacity of 350 ampere provided that cranes of the vessel cannot be used for operation and left idle. Charterers have the right to fit magnets or other loading/discharging equipment customary to the trade onto vessel's cranes subject to vessel's lifting capacity. Charterers to arrange the outlet/socket/ suitable cabtire cables and other necessary fittings at the Charterers' time, risk

10

# RIDER CLAUSES TO M.V. "AFRICAN LEOPARD" CHARTER PARTY DATED

and expenses.

61. **Protective Clauses**

The New Jason Clause, Both-to-Blame Collision Clause, New Both-to-Blame Collision Clause to be read as per standard printing and not be influenced by any mis-typing, the General Paramount Clause, U.S Clause Paramount, Canadian Clause Paramount, Conwartime 1993, P & I Bunkering Clause as applicable and attached are all to be considered incorporated into this Charter Party and all Bills of Lading issued under this Charter shall include all said clauses.

The USA/Canadian Clause Paramount as applicable or the Hague Rules as enacted in countries other than the USA or Canada as applicable to be incorporated in all Bills of Lading.

62. **Punctual Payment**

Referring to lines 60 and 61, where there is any failure to make "punctual and regular payment", Charterers shall be given by Owners 3 banking days written notice excluding Saturdays, Sundays and holidays  to rectify the failure before exercising any right of withdrawal and where so rectified the payment shall stand as punctual and regular payment.

63. **Sea Carrier Initiative Agreement**

Owners and Charterers confirm that they are both signatories to the Sea Carrier Initiative Agreement in order to co-operate with the U.S. Customs Service in the fight against the drug menace.

64. **Delete**

65. **Stevedore Damage**

Should any damage be caused to the vessel or her fittings by the Charterers or their stevedores the Master is to

a)      Give written notice to the Charterers or their Agent or servant within 48 hours of full particulars of the damage caused and name of the party allegedly responsible for the damage.

11

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

b)   Promptly but latest within 24 hours of the occurrence give written notice to the party allegedly responsible, giving full particulars of the damage and its alleged cause and obtain the written acknowledgement of liability from such party, or failing that, the acknowledgement of receipt of such notice.

c)   Immediately arrange, in conjunction with Charterers' Agents, for the damage to be surveyed and an estimate of the repair costs given. Such time spent for damage survey shall be counted on hire and surveyors' fees to be paid by Charterers.

Failing the aforementioned the Charterers are not to be responsible for such damage and/or loss of time, except for hidden damage which must be attended to as per the above procedure immediately it is discovered, but latest prior to redelivery.
Damage affecting vessel's seaworthiness or trading capability to be repaired prior redelivery, other damage may be left to next regular drydock if required.

66.   **Taxes**

Taxes and/or dues and/or charges and/or freights and/or hires and/or sub-hires whatsoever imposed on cargo by any local or national authorities arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party shall be for Charterers' account.

67.   **Trading Limits**

Worldwide trading always afloat, see Clause 64, within institute warranty limits via safe berth(s), safe port(s), safe anchorage(s) excluding: Sudan, Turkish occupied Cyprus. Cuba, Israel, Iraq, Cambodia, North Korea, Somalia, Ethiopia, Syria, Liberia, Serbia, Montenegro, Russian/CIS Pacific ports and any area(s) and/or countries banned and boycotted by USA/United Nations, war or war-like zone and any other countries prohibited from calling by the flag state.

Charterers' liberty to trade Arabian Gulf (always excluding Iraq) provided there are no war activities evidenced by further increase in war risk premium over levels pertaining on date of this charter party and trading or operation of the ship and or crew not restricted by Greek government and/or seaman's union.

Vessel not to be required to trade or proceed directly between China and Taiwan or Taiwan and China.

Embargoes

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

The Charterers undertake not to load cargo for a port where there is an existing embargo or boycott against the flag and nationality of this vessel which in existence prior to Charterers' declared intention to call such port. Charterers' trading of the vessel not to expose Owners to blacklisting.

Vessel not to trade in countries or areas where U.N. or U.S. embargo exists.

On vessels under 15 years Australia, New Zealand, Sweden, Finland to be allowed from day of delivery. Owners confirm all vessels and crew are fitted with full ITF or equivalent agreement acceptable to ITF on vessels.

Should vessels over 15 years on delivery not be suitable to trade Australia and New Zealand then Owners allowed a maximum of 3 month "grace" period to prepare vessels to trade Australia and New Zealand. However, the vessels over 15 years not to be allowed to trade Finland and Sweden at any time.

68.    Deleted.

69.    **Warranties**

Owners warrant that as from date of new ownership:

-    is not blacklisted by Arab countries nor anywhere else within the agreed trading limits

-    has not traded Cambodia, Cuba, Israel and North Korea

-    is eligible for bunkers in the United States of America, its territories and possessions in accordance with directives from the United States Department of Commerce, Office of International Trade.

70.    **Watertight Hatches**

The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatchcovers are watertight. All hatches are to be carefully attended by the crew to prevent leakage.

71.    **Weather Routing**

The Charterers may supply an independent weather bureau advice to the Master during voyages specified by the Charterers and the Master shall comply with the reporting procedures of the weather bureau, however, the Master remains responsible for the safe navigation and choice of route. Evidence of weather conditions shall be taken from vessel's deck logs and

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD" CHARTER PARTY DATED

independent weather bureau's reports

72. Deleted.

73. This fixture to be kept strictly private and confidential.

74. Deleted.

75. **Hire Details**

    Hire

    USD  daily including overtime payable 15 days in advance

    Hire payable into Owners' bank account nett of any deductions/transmitting cost from remitting bank.

76. Deleted.

77. **Bill of Lading**

    When and if required Charterers may carry one original Bill of Lading onboard against which the cargo may properly be released on instructions received from Shippers/Charterers.  All such Bills of Lading must incorporate the following wording "One original Bill of Lading retained on board against which Bill delivery of cargo may properly be made on instructions received from Shippers/Charterers"

78. **I.S.M.**

    From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code.

    Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.  Any loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

79. Deleted.

80. Deleted.

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

81.   Charterers have the option to perform hose/pressure/ultrasonic or similar test
      at their own expense.  In case the vessel fails such survey Owners to rectify
      the same at their own time and cost and cost and time of the subsequent test(s)
      to be for Owners' account.

82.   Deleted.

83.   Deleted.

84.   **Inspection**

      The Charterers or their nominee has the right to inspect the vessel and its
      records at any given time during the currency of this Charter.  Owners/crew
      are to fully co-operate during such inspection.  Vessel to remain on hire during
      inspection(s) ordered by Charterers.

85.   **Lay-Up**

      The Charterers shall have the liberty or order the laying up of the vessel at a
      safe berth or port for any period of this Charter.  In the event of such lay up,
      Owners shall promptly take steps to effect all possible economies in operation
      costs if so required by Charterers.  The Owners will estimate all such savings
      including (but not limited to) reductions in insurance and manning costs.  If
      the vessel is laid up the Charter hire shall be reduced by the amount of any
      savings actually made by the Owners during the laying up period.

      Charterers shall bear any expenses related to re-activation of the vessel.
      Owners shall not be penalised for reduction of speed due to marine growth
      after laying up and bottom cleaning, if required, shall be held at Charterers'
      time and expense.

86.   **War Cancellation**

      In the event of war between/among People's Republic of China, Russia,
      United States of America, Britain and Greece which directly affecting the
      performance of this Charter, both the Charterers and the Owners have the
      option of cancelling this Charter Party.  In any event such cancellation shall
      take place after discharge of cargo at the destination.

87.   **Vessel's Performance**

      If the Charterers have reason to be dissatisfied with the performance of the
      vessel provided for in the Charter Party, the Owners on receiving particulars
      of complain(s) shall immediately investigate and take appropriate steps to
      correct the situation.

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

88.   Deleted.

89.   Deleted.

90.   Deleted.

91.   Deleted.

92.   **Sea Waybills**

Whenever Charterers issue Sea Waybills instead of Bills of Lading, such Sea
Waybills shall always be deemed to incorporate all the terms and conditions,
liberties, clauses and exceptions of this Charter Party including the Law and
Arbitration Clause, Paramount Clause, General Average Clause, New Jason
Clause and Both-to-Blame Collision Clause.

Owners shall deliver the cargo to a party or parties nominated by Charterers as
Consignee written in the Waybill and once cargo has been thus delivered
Owners shall not be responsible for any non-delivery claim from other parties.

93.   **Drydocking**

The Owners shall have the option to place the vessel in drydock during the
currency of this Charter at a convenient time and place to be mutually agreed
between the Owners and the Charterers for bottom cleaning and painting
and/or repair as required by class or directed by circumstances.

94.   **Bills of Lading**

Whilst, as mentioned elsewhere in this Charter Party, Charterers or their
agents have the authority to sign Bills of Lading on Master's behalf, it is
agreed that Bills of Lading will be claused with remarks as actually appearing
on Mate's receipts.

In the event that vessel trades to the USA then bills of lading to be made out in
a way acceptable to the US authorities failing which Charterers to be liable for
any fines, delays or expenses arising therefrom.

95.   **Admixture Clause**

Whilst Charterers have the option to load two or more cargoes in the same
hold, Charterers to supply, erect, dismantle and dispose of any and all
separations at their risk and expense. Final distribution and position of any
cargo within vessel and holds to be at Master's discretion and to his
satisfaction. Any claims arising from contamination or admixture or sweat
damage to cargo carried in the same hold to be for Charterers' account. Should
Charterers load containers, Owners not to be responsible for stowage of cargo

<u>**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**</u>
<u>**CHARTER PARTY DATED**</u>

in containers, nor cargo claims arising therefrom.  Owners not to be
responsible for stuffing or unstuffing of containers

96. <u>**Hamburg Rules**</u>

Neither Charterers nor their agents shall permit the issue of any Bill of Lading,
waybill or other document evidencing a contract (whether or not signed on
behalf of the Owners or on the Charterers behalf or on behalf of any
Subcharterers incorporating where not compulsorily applicable, the Hamburg
Rules or any legislation giving effect to the Hamburg Rules or any other
legislation imposing liabilities in excess of the Hague or Hague Visby Rules.

97. <u>**Embargo**</u>

The Charterers undertake not to load cargo for a port where there is an existing
UN or USA embargo or where there is a boycott against the flag and/or
nationality of this vessel which is in existence prior to Charterers declared
intention to call such port.

98. <u>**Necessaries Clause**</u>

In no event shall Charterers procure, or permit to be procured, for the vessel,
any supplies/services on the credit of the vessel or her Owners.

99. <u>**Use of Charterers agents**</u>

Charterers agree that their agents will undertake without charge normal ship's
husbandry as Owner's agents if required by Owners. However, this does not
include any extraordinary business such as major crew changes, major repairs,
dry docking, general average, etc., when Owners are obliged to appoint their
own agent or to employ and adequately fund in advance Charterers' agents at
the local recognised agreed agency tariff.

100. <u>**Bunker Quality/ supply clause**</u>

Charterers to supply vessel with Intermediate Fuel Oil (180 CST)  ISO 8217
1987 RME - 25  or RMF25. Charterers to supply bunkers only in accordance
with these specifications and subsequent amendments or bunkers of similar
specification available at port of bunkering.  In any case bunkers not to be
inferior than those described above.
Replenishment of bunkers is arranged and paid for by the Charterers under the
supervision of the Master/Chief Engineer.  Master to pay due diligence so that
vessel does not cause oil spillage from vessel during bunkering.   Master not to
be responsible for actions/lack of diligence of bunkering barge or bunker
supplier or any spillage caused by bunkering barge.

Samples to be taken (by drip method where possible) whilst bunkering, one set

17

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
CHARTER PARTY DATED**

to be held on board. Vessel not to be called upon to bunker outside of port limits without prior approval of Owners.

101.  **Ballast Water**

Any detergent/disinfectant required by authorities to be added to ballast water in order to enable the vessel to ballast/deballast holds/spaces within national waters of respective countries, to be supplied by Charterers, and this to be done at Charterers time, risk and expense.

102.  **Additional Equipment**

Any additional equipment required at ports over and above that which the vessel has on board), to be hired/and/or supplied by Charterers at their time and expense.

103.  **Garbage Removal, Gangway Watchmen**

Dues for garbage removal and gangway watchmen, which are a compulsory requirement of the port, and thus a normal port expense, to be for Charterers account. If such items are not compulsory port expenses, then same to be for Owners' account.

104.  **Performance claims**

In the event that Charterers wish to make a performance claim against the vessel, any claim to be fully documented. Any performance disputes to be decided as final by giving equal weight to log and Ocean Routes.

105.  **Crane breakdown.**

In the event of a disabled crane or cranes, or insufficient power to operate cranes, Owners to pay for suitable shore engine(s) or crane(s) and also for any stevedore standby directly occasioned thereby. Hire to be reduced proportionately to the total number of operative hatches intended to be worked at the time, for all time lost due to the crane or cranes being unavailable as a result of disability or loss of power. However, once sufficient shore cranes ordered by Owners are in place then full hire to resume.

106.  **Paperless trading**

Owners/Master not to be called upon to participate in, or use any system or contractual arrangement the predominant purpose of which is to replace paper

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

based documentation in shipping or international trade with electronic
messages, including, without limitation, the 'Bolero System' or other paperless
system. Any contract of carriage or bill of lading to be evidenced by a paper
document.

107.  **Speed/Consumption**

Vessel's speed and consumption as warranted elsewhere in this Charter Party
is warranted in good weather conditions up to Beaufort force 4 and Douglas
Seastate 3. Calculation of vessel's performance on both laden and ballast
passages to be based upon average speed/ consumption during weather days
up to Beaufort 4 and Douglas Seastate 3. Laden or ballast speed and
consumption for period of weather in excess of Beaufort 4 and Douglas
Seastate 3 is to be expressly excluded from calculations.

108.  **BIMCO ISPS Clause for Time Charter Parties**

**(a)**

**(i)** From the date of coming into force of the International Code for the
Security of Ships and of Port Facilities and the relevant amendments to
Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter
during the currency of this Charter Party, the Owners shall procure that both
the Vessel and "the Company" (as defined by the ISPS Code) shall comply
with the requirements of the ISPS Code relating to the Vessel and "the
Company". Upon request the Owners shall provide a copy of the relevant
International Ship Security Certificate (or the Interim International Ship
Security Certificate) to the Charterers. The Owners shall provide the
Charterers with the full style contact details of the Company Security Officer
(CSO).

**(ii)** Except as otherwise provided in this Charter Party, loss, damage, expense
or delay, excluding consequential loss, caused by failure on the part of the
Owners or "the Company" to comply with the requirements of the ISPS Code
or this Clause shall be for the Owners' account.

**(b)**

**(i)** The Charterers shall provide the CSO and the Ship Security Officer
(SSO)/Master with their full style contact details and, where sub-letting is
permitted under the terms of this Charter Party, shall ensure that the contact
details of all sub-charterers are likewise provided to the CSO and the
SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter
parties they enter into during the period of this Charter Party contain the
following provision:

"The Charterers shall provide the Owners with their full style contact details
and, where sub-letting is permitted under the terms of the charter party, shall

<u>RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"</u>
<u>CHARTER PARTY DATED</u>

ensure that the contact details of all sub-charterers are likewise provided to the Owners".

**(ii)** Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

**(c)**

Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(d)**

If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

109. <u>U.S. Customs Advance Notification/ AMS Clause for Time Charter Parties</u>

(A) If the vessel loads or carriers cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall comply with the current U.S. customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

   i) Have in place a SCAC (Standard Carrier Alpha code);
   ii) Have in place a ICB (International Carrier Bond);
   iii) Provide the Owners with a timely confirmation of i) and ii) above; and
   iv) Submit a cargo declaration by AMS (Automated Manifest System) to the U.S. Customs and provide the Owners at the same time with a copy thereof.

(B) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (A). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the vessel shall remain on hire.'

(C) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

promptly reimburse the Charterers for those amounts.

(D) The assumption of the role as carrier by the Charterers pursuant to this Clause and for the purpose of the U.S. Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

### BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### BOTH TO BLAME COLLISION CLAUSE

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules 1974 but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which or for the consequence of which the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

### GENERAL CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the carrier of any statutory protection or exemption from, or limitation of, liability.

### CANADIAN CLAUSE PARAMOUNT

This Bill of Lading, so far as it relates to the Carriage of Goods by Water, shall have effect, subject to the provisions of the Water Carriage of Goods Act 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent such terms shall be void to that extent but no further.

### U.S.A. CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved 16 April, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

## RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"
## CHARTER PARTY DATED

### BIMCO Standard War Risk Clauses for Time Charters 1993
### Code Name "CONWARTIME 1993"

1    For the purpose of this Clause the words:

    a)  "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the vessel and the Master and

    b)  "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group or the government of any state whatsoever which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2    The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through any port, place, area or zone (whether of land or sea) or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners may be, or are likely to be, exposed to war risks. Should the vessel be within any such place as aforesaid which only becomes dangerous or is likely to be or to become dangerous after her entry into it, she shall be at liberty to leave it.

3    The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels or is imposed selectively in any way whatsoever against vessels of certain flags or ownership or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

4

    a)  The Owners may effect war risks insurance in respect of the hull and machinery of the vessel and their other interests (including but not limited to loss of earnings and detention, the crew and their Protection and Indemnity risk) and the premiums and/or calls therefore shall be for their account.

    b)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within or is due to enter and remain within any area or areas which are specified by such Under- writers as being subject to additional premiums because of war risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

**RIDER CLAUSES TO M.V. "AFRICAN LEOPARD"**
**CHARTER PARTY DATED**

5    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6    The vessel shall have liberty:

    a)   to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any other way whatsoever which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

    b)   to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

    c)   to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supernational body which has the right to issue and give the same and with national laws aimed at enforcing the same to which the Owners are subject and to obey the orders and directions of those who are charged with their enforcement;

    d)   to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier.

    e)   to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7    If in accordance with their rights under the foregoing provisions of this Clause the Owners shall refuse to proceed to the loading or discharging ports or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8    If in compliance with any of the provisions of sub-clause (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

⊠

**MUR Shipping B.V.**

C/O MUR Shipping RSA (Pty)
Ltd.
P.O.Box 8370
Johannesburg 2000
Republic of South Africa
Tel: +27-11-3020000
Fax: +27-11- 8831545
Shipping@mur.co.za
VAT reg.No.4250207273

Pioneer Right                                                    19 May 2008
c/o Maersk Broker (UK) Ltd

# Hire Statement Recap

**m.v. African Wildcat - C/P 24 September 2007 - FBV12395 CMUR**

| Date of delivery: | 02-10-07 03:00 UTC | | |
|---|---|---|---|
| Date of redelivery: | 16-03-08 16:30 UTC | | |
| **Total days on hire:** | 166.562500 | | |
| **Bunkerquantities mt:** | **IFO** | **MDO** | **MGO** |
| Delivery: | 378.90 | 38.53 | 0.00 |
| Redelivery: | 168.50 | 34.30 | 0.00 |
| **Bunkerprices USD:** | | | |
| Delivery: | 400.00 | 675.00 | 0.00 |
| Redelivery: | 400.00 | 675.00 | 0.00 |

**USD**

**T/C Hire:**

02/10 03:00 hrs - 16/03 16:30 hrs UTC 166.5625 days at USD 39,500.00                6,579,218.75

**Off-hire:**

| | | |
|---|---|---|
| African Wildcat 10/10 22:30 - 12/10 08:30 (Off-hire due to fuel transferring problems) 1.416667 days at USD 39,500.00 | (100 pct ) | (55,958.33) |
| 04/11 00:00 hrs - 16/11 13:30 hrs 12.562500 days at USD 39,500.00 | (100 pct ) | (496,218.75) |
| 23/11 12:15 hrs - 24/11 08:30 hrs 0.843750 days at USD 39,500.00 | (100 pct ) | (33,328.13) |
| 23/12 21:15 hrs - 29/12 22:20 hrs 6.045139 days at USD 39,500.00 | (100 pct ) | (238,782.99) |
| Off-hire due to crane repair Bata (9.91667 days) | (0 pct ) | (391,708.47) |
| 23/12 16:00 hrs - 23/12 21:15 hrs 0.109375 days at USD 39,500.00 | (50 pct ) | (4,320.31) |
| Off-hire due to main engine repair (7.95097 days) | (0 pct ) | (314,063.3 |

**Commissions deducted 3.75%**                                           (189,181.

EXHIBIT

B

**Bunkers on delivery**
IFO 378.896 mts at USD 400 — 151,558.40
MDO 38.527 mts at USD 675 — 26,005.73

**Bunkers on redelivery**
IFO 168.5 mts at USD 400 — (67,400.00)
MDO 34.3 mts at USD 675 — (23,152.50)

**Bunkers during off-hire**
African Wildcat IFO cons. 16.800 x 400 — (6,720.00)
African Wildcat MDO cons. 3.500 x 675 — (2,362.50)
04/11 IFO Lumpsum consumption 34.579 Mt at USD 400.00 — (13,831.60)
04/11 MDO Lumpsum consumption 7.429 Mt at USD 675.00 — (5,014.58)
23/11 MDO Lumpsum consumption 1.400 Mt at USD 675.00 — (945.00)
 IFO Lumpsum consumption 17.850 Mt at USD 400.00 — (7,140.00)
 MDO Lumpsum consumption 17.850 Mt at USD 675.00 — (12,048.75)
 IFO Lumpsum consumption 21.802 Mt at USD 400.00 — (8,720.80)
 MDO Lumpsum consumption 0.500 Mt at USD 675.00 — (337.50)

**Communication/Entertainment/Victualling USD 1,200 per month pro rata** — 6,571.22

**Communication/Entertainment/Victualling during offhire**
10-10-07 10:30 PM - 12-10-07 08:30 AM - 1.416667 days at USD 1,200 per month pro rata — (55.89)
04-11-07 12:00 AM - 16-11-07 01:30 PM - 12.562500 days at USD 1,200 per month pro rata — (495.62)
23-11-07 12:15 PM - 24-11-07 08:30 AM - 0.843750 days at USD 1,200 per month pro rata — (33.29)
23-12-07 04:00 PM - 23-12-07 09:15 PM - 0.109375 days at USD 1,200 per month pro rata — (4.32)
23-12-07 09:15 PM - 29-12-07 10:20 PM - 6.045139 days at USD 1,200 per month pro rata — (238.49)

**Charterers expenses**
Intermediate Holdcleaning - Charterers a/c — 4,000.00
C/V/E correction for off-hire due crane reair Bata (9.91667 days) — (391.23)
C/V/E correction for off-hire due to main engine repair (7.95097 days) — (313.68)

**In lieu of hold cleaning** — 4,500.00

**Actual owners expenses**
On-hire Survey (China Eq Marine) — (300.00)
Shore mobile crane hire Pointe Noire (euro 15222) — (22,376.34)
Off-hire Survey (China Eq) — (300.00)
With-held for Owners Expenses (usd 500 x 5) — (2,500.00)
Reverse "Shore mobile crane hire Pointe Noire (euro 15222)" — 22,376.34
Shore mobile crane hire Pointe Noire — (24,625.48)

**Payments:**

African Wildcat - 1st hp — (748,528.03)
African Wildcat - 2nd hp — (503,740.88)
African Wildcat - 3rd hp — (570,873.03)

Final Hire In Statement

| | |
|---|---:|
| African Wildcat - 4th hp | (73,900.68) |
| African Wildcat - 5th hp | (570,853.03) |
| African Wildcat - 6th hp | (570,873.03) |
| Charterers payment 05-02-08 | (574,873.03) |
| Charterers payment 30-01-08 | (289,573.35) |
| Charterers payment 07-01-08 | (541,823.28) |
| Correction - bank charges hp 2 | (20.00) |
| Correction - bank charges hp 4 | (20.00) |
| Correction - bank charges hp 5 | (20.00) |
| Correction - bank charges hp 8 | (20.00) |
| Correction - bank charges hp 7 | 0.10 |
| Correction - bank charges hp 10 | (12.50) |
| Charterers payment no 10 | (232,708.71) |

**Balance in Owners favour**                                     193,521.68

**Estimated expenses**

| | |
|---|---:|
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |

**Total estimates**                                             0.00

: